Filed 4/6/23  P. v. Sanchez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| THE PEOPLE, | C094511 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF-19-00937-01) |
| v. | |
| AVERY ELIJAH SANCHEZ, | |
| Defendant and Appellant. | |

On May 22, 2019, defendant Avery Elijah Sanchez and codefendant Vivion Deandre Wallace, riding in codefendant Juan Antonio Barajas's car, fired several shots at Robert M., Victor D., and Alejandro Escobar, who were in Robert M.'s car, as the two cars were driving south on State Route 70.[1]  Escobar died from a gunshot wound and

---

[1]     We use the victim's first name and last initial in compliance with California Rules of Court, rule 8.90(b)(4).

1

Victor D. sustained a gunshot wound to the shoulder. A jury found defendant guilty of the first degree murder of Escobar and attempted murder of Victor D. and Robert M.

On appeal, defendant asserts (1) the trial court abused its discretion in admitting prejudicial gang expert testimony even though he was not charged with any gang enhancement or substantive gang crime, (2) the evidence was insufficient to support his convictions because, while the prosecution's theory was that the shooting was gang-motivated, there was not substantial evidence to prove the existence of a criminal street gang satisfying all statutory elements, and (3) even if we conclude the evidence was not insufficient to support his convictions due to the absence of sufficient proof of the existence of a gang, the evidence was insufficient to support his convictions on a gang-motivated theory.

We affirm.

BACKGROUND

The prosecution charged defendant in an information with the first degree murder of Escobar (Pen. Code, §§ 187, subd. (a), 189, subds. (a), (e); count I),[2] attempted murder of Victor D.[3] (§§ 664, subd. (a), 187, subd. (a); count II), and attempted murder of Robert M. (§§ 664, subd. (a), 187, subd. (a); count III). In connection with count I, the information alleged the murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle intentionally at another person or persons outside of the vehicle with the intent to inflict death (§ 190.2, subd. (a)(21)), and various firearm enhancements (§§ 12022.53, subds. (b)-(d), 12022.5, subd. (a)). In connection with counts II and III, the information alleged various firearm enhancements. (§§ 12022.53,

---

**2** Further undesignated references are to the Penal Code.

**3** The information refers to a name corresponding with the initials Victor T. Otherwise, the record generally employs a name corresponding with the initials Victor D. There is no dispute this is the same person.

2

subds. (b)-(c), 12022.5, subd. (a).) Additionally, the information alleged defendant had sustained two or more prior strike convictions and four prior serious felony convictions. The information charged Wallace in counts I-III with the same firearm enhancements and charged Barajas with being an accessory after the fact. (§ 32; count IV.)

I

*The Prosecution Case*

A. *The Shooting*

1. *Victor D.'s and Robert M.'s Accounts*

On May 22, 2019, Victor D. and Robert M., who were cousins, and Escobar, their uncle, finished work and started driving home from Chico to Sacramento in Robert M.'s car. Robert M. drove, Victor D. sat in the front passenger seat, and Escobar was lying down in the back seat. There was a blue hat on the dashboard of Robert M.'s car that he always kept there. Robert M. testified the hat was a "Boston B" baseball hat, and then stated, "I think it was Boston."

At a traffic light, Robert M., in the left lane, looked at the car next to him in the right lane. Victor D. saw the driver and a front seat passenger in the other car but initially did not see anyone in the back seat. The driver and front seat passenger in that car looked back. At trial, Robert M. and Victor D. both identified defendant as the front-seat passenger. According to Robert M., defendant "looked kind of aggressive" or "hard."

As they continued to drive, Robert M. noticed the other car was following them. The car pulled right next to Robert M.'s car. The occupants of the two cars stared at each other. The people in the other car made hand gestures and, according to Victor D., displayed the number four with their hands.

Defendant was wearing a hooded sweatshirt, and he put his hood on and pulled the drawstring so that only the middle of his face was visible. The rear window of the other vehicle opened, and Victor D. and Robert M. then both saw another man in the back seat.

3

At this point, the two cars were right next to each other. Robert M.'s car was still in the left lane, and the other car was in the right lane, a couple of feet back.

Victor D. and Robert M. heard an initial gunshot. Then they heard more gunshots and glass breaking and they ducked.

According to Victor D., the front seat passenger in the other car sat "on the window. Like got out the car to sit and look towards us." Asked if he saw "that over the top of the car or in–or in the car," Victor D. testified, "[o]n top of the car." Victor D. testified he saw the front seat passenger, defendant, shooting, but he also testified he could not say whether he saw defendant with a gun.

Robert M. saw the back seat passenger with his hand extended. Robert M. thought the man in the back was shooting at them. Meanwhile, Robert M. did not see what the front seat passenger was doing because Robert M. "was ducked the whole time." Robert M. estimated there were 10 to 15 shots fired.

Robert M. pulled to the side of the road. He saw the other vehicle get off the highway, go over the overpass, and get back on the highway traveling in the other direction.

2. *Barajas's Account*

Barajas testified for the prosecution. He acknowledged pleading guilty to being an accessory to murder.

On May 22, 2019, Barajas was going to drive to his mother's motorcycle shop in Gridley. Wallace and defendant accompanied him. Later, when returning from the motorcycle shop, Barajas was driving, Wallace was in the back seat, and defendant was in the front passenger seat. Near Marysville, they stopped at a traffic light.

At the traffic light, a car pulled up alongside them and defendant and Wallace grew pretty "heated" or "upset" looking at the car next to them. According to Barajas, there "was an intense stare-down between the passengers in [Barajas's] car and the passengers in the other car." Barajas did not see anyone make any gestures. Defendant

4

said the people in the other car were "mean mugging" him and staring at him. Defendant also said the people in the other car "think they're hella hard" and "fuck these dudes." The light turned, and the cars proceeded.

Defendant and Wallace told Barajas to catch up to the other car. They continued driving south on State Route 70 for seven to 10 minutes with the other car in view the entire time. Defendant and Wallace were still upset.

As Barajas caught up with and drove alongside the other car, Wallace shifted from the passenger side of the back seat to the driver's side of the back seat and put down the rear window. Defendant put on his hood and tightened the drawstrings so that "not a whole lot of" his face was exposed. Defendant then stood up through the open sunroof. Barajas heard gunshots, both from behind him and from above his head. He heard approximately 10 gunshots. Defendant was standing in the sunroof for three to five seconds. After defendant came down from the sunroof, Barajas did not hear any more gunshots. When he came down from the sunroof, Barajas saw a black gun in defendant's hand.[4] Defendant tucked the gun into his waistband. After the gunfire, the other car slowed down while Barajas kept driving and, following defendant's and Wallace's directions, exited State Route 70 south at the Feather River Boulevard exit, went over an overpass, and got onto State Route 70 north.

Barajas drove to a house where Wallace and defendant went inside. When they came back out, they all sat on a brick wall. Wallace activated a police scanner application on his phone. They heard something about a shooting on State Route 70 and

---

[4] Barajas acknowledged on cross-examination that, in two interviews with law enforcement, he did not say that he had seen defendant with a gun in his hand. Barajas testified, however, he was not untruthful in the interviews: "I did not lie to Detective Thomas. I had not seen a gun in his hand or in his waistband. I had seen it from when he came down from the sunroof." Barajas repeatedly testified at trial he did see a gun in defendant's hand when defendant came down from the sunroof.

the broadcast indicated law enforcement knew the color of Barajas's car. The broadcast then said someone had been shot. Wallace and defendant high-fived each other in a way Barajas interpreted as saying, "we got them." Later, at another location, they learned from the police scanner application that a victim had died from the shooting. Wallace and defendant seemed surprised.

B.      *The Aftermath*

A paramedic pronounced Escobar dead at the scene. Escobar had wounds on the bridge of his nose and on the right side of his back near his hip. The wound to Escobar's nose was consistent with a gunshot wound but was not fatal. The parties stipulated: "Dr. Reiber also examined the circular-shaped trauma to Mr. Escobar's right rear hip. That injury was also consistent with a gunshot wound. . . . [¶] . . . Dr. Reiber tracked the path of the bullet that entered Mr. Escobar's right hip. Dr. Reiber located a bullet in Mr. Escobar's left shoulder and noted that the bullet had entered Mr. Escobar's right hip traveling upwards in a steep right-to-left direction. As a result of the bullet traveling from Mr. Escobar's right hip and through the torso, the bullet struck the right kidney, large intestine, diaphragm, liver, lower lobe of the right lung, mediastinum, upper lobe of the left lung, and grazed the esophagus resulting in a tracheal injury. [¶] Dr. Reiber concluded that the cause of Mr. Escobar's death was the gunshot wound to his right hip and torso." A .40-caliber bullet was recovered during the autopsy. Meanwhile, Victor D. suffered a gunshot wound to the shoulder.

C.      *The Investigation of the Crime Scene and the Victims' Vehicle*

Law enforcement located, through surveillance video, what they believed to be the vehicle driven by the shooters. In one surveillance video, the vehicle can be seen exiting Feather River Boulevard at approximately 5:46 p.m. Law enforcement obtained another surveillance video from Barajas's mother's motorcycle shop which showed the vehicle associated with the suspects in the parking lot. A person wearing a red polo shirt can be seen getting into the driver's seat, a person with a ponytail can be seen getting into the

6

front passenger seat, and a person with a white shirt can be seen getting into the back seat. Detective Fernando Machuca identified the person in the red shirt as Barajas, the person with the ponytail as defendant, and the person in the white shirt as Wallace.

Law enforcement found nine-millimeter, .30-caliber, and .40-caliber cartridge casings at the scene.[5] Anna Brewer, a senior criminalist for the Department of Justice, Bureau of Forensic Services, testified as an expert in crime scene and evidence processing. She documented nine bullet holes in Robert M.'s vehicle. Brewer placed trajectory rods through the bullet holes. Brewer identified the bullet holes using letters A through I. The bullet holes, marked with trajectory rods, uniformly indicated up-to-down trajectories. The bullet holes progressed, from A to I, from the back of the victims' car towards the front. Brewer collected six bullet fragments from the vehicle.

Brewer did not measure the angles of the trajectory rods. Because there were several unknown variables, she determined measuring the angles of the trajectory rods "wasn't necessary." Also because of the unknown variables, she did not perform any modeling to determine the height from which shots were fired. She testified it was possible the shots were fired from different heights.

D.    *Further Investigation*

On May 20, 2019, two days before the shooting, defendant exchanged Instagram messages with another user. In the exchange, the other user asked defendant, "What kind." Defendant responded, "22 gen 2." In the next message, he stated, "Gen 3." According to Detective Andrew Thomas, based on his experience, these were references to Glock handguns.

---

[5]    The parties do not reference a .30-caliber cartridge casing. It is conceivable this is a mistranscription, as the testimony describes a photograph "showing a .30 caliber and also a Federal," immediately after the witness identified, in another photograph, "a spent shell casing from a .40 caliber Federal."

On May 27, 2019, five days after the shooting, Sacramento County deputy sheriffs responded to a call reporting a group of males in the area of Fruitridge Community Park loading ammunition into a gun magazine. Chase Boyce testified he was hanging out with Wallace and others in Fruitridge Community Park when law enforcement arrived. Law enforcement found six individuals standing around two cars including Boyce, Wallace, and four others. One individual ran away. A deputy pursued that individual but did not catch him.

In the area where the individual had run, officers found a dark green handgun loaded with nine-millimeter rounds. Additionally, a deputy located approximately four rounds of nine-millimeter ammunition where the pursuit had begun. Near the cars, officers found a backpack containing gun magazines and nine-millimeter ammunition and found more nine-millimeter ammunition in Boyce's glove compartment. Officers found a loaded black Glock model 22 .40-caliber handgun on top of one of the tires of Boyce's car. Boyce's stepfather reported to Detective Thomas that Boyce had told him defendant was the one who ran and "ditched the gun." Boyce's stepfather told Thomas that Wallace had placed his gun on the car's front tire.

At approximately 2:02 a.m. on the morning of May 28, 2019, defendant sent a text message to another user saying, "its ba[d]." The other person responded, "[I] thought you was with him," and defendant replied, "I ran." At approximately 2:15, defendant sent a text message to another user stating, "[I] lost my pole [I] have to get a new one," and "For real [I] rather be in prison then dead." According to Detective Thomas, "pole" is slang for a firearm. At approximately 2:22, defendant sent a text message to someone saying, "they got my pole." The other person responded, "I think they do." Defendant asked, "Why what was they saying," and the other person responded, "They find a gun." At approximately 2:30, defendant sent a text message to Wallace saying, "Did you hear on the scanner them say they found two thangs." At approximately 2:37, defendant asked Wallace, "so you think they found my shit," to which Wallace responded, "Idk but they

8

said they found one over by a park front." Defendant replied, "Fuck its over." They then discussed fingerprints and ghost guns. At approximately 6:02 p.m., defendant said to Wallace, "Im sick," and Wallace responded, in part, "how you think im feeling rn." At approximately 9:07, defendant sent a text message to Wallace stating, "I feel buttnaked." Wallace responded, "I feel like a piece of my soul is missing," and defendant replied, "Breh tell me about it." Wallace said, "Im hurt," and defendant replied, "They looking for us."

Brandy Spaas, a senior criminalist for the Department of Justice, testified as an expert in ballistics and firearms. She examined the Glock model 22 and the green handgun loaded with nine-millimeter rounds found in the park. The green handgun was a "kit gun" or "ghost gun."

Spaas testified eight of the 10 cartridge casings recovered from the scene of the shooting were consistent with the Glock model 22 recovered in this case and shared individual characteristics with that firearm. None of the cartridge casings matched the green ghost gun.

Asked about the six bullets and bullet fragments recovered from the victims' car, Spaas testified: "Well, some were more intact than others. Some were pretty much whole bullets. Some were just fragments. But the ones that were intact enough for me to take measurements, were consistent with a .40 caliber bullet." Spaas could not determine the caliber of the bullet fragments, but they were "consistent with a polygonally rifled pistol such as a Glock." She agreed that "there was nothing found in the [victims'] car that was any affirmative evidence that any other caliber was utilized to fire at this car . . . ." However, she also testified that there was no way of knowing what gun was used in connection with three "unaccounted [bullet] holes in the victim's car," the bullet holes "that have no associated bullet fragments." Spaas also acknowledged that there is, of course, no way to determine whether any bullets fired missed the victims' car completely.

Following his arrest, defendant admitted that, on the day of the shooting, he was in the car with Wallace and Barajas. However, he denied being in the car at the time of the shooting. He said that Barajas and Wallace had dropped him off at his mother's house before the shooting occurred.

When called to testify for the prosecution, Wallace refused to answer questions. Finding Wallace to be unavailable, the trial court admitted Wallace's plea transcript into evidence. Wallace pleaded guilty to murder on count I and attempted murder on counts II and III and admitted to enhancements in exchange for a stipulated sentence of 62 years to life in prison. Wallace admitted he was the back seat passenger in Barajas's car, that he fired multiple shots at the victims' vehicle, that Escobar "was struck by gunfire from the vehicle I was in and died from a gunshot wound," and that Wallace "willfully, deliberately and with premeditation attempted to kill all three men in the other vehicle."

## II

### *The Defense Case*

Chris Coleman, a senior forensic scientist with Forensic Analytical Crime Laboratory, considered whether the victims' vehicle could have been shot at from the area of the sunroof of Barajas's car. He concluded the shots could not have been fired from the top of Barajas's car. He testified the "angles depicted in the trajectory rods are too shallow to have been fired from the top of the vehicles when the vehicles were that close together." On cross-examination, Coleman testified he did not have enough information to determine the height from which each shot was fired into the victims' car. He also acknowledged the possibility someone standing in the sunroof could lean over and fire a gun from below the roof line.

Coleman acknowledged two cartridge casings recovered in this case were excluded as having been fired from any of the recovered firearms. The intact bullets recovered were all "approximately .40 caliber" and all had similar rifling impressions. Coleman further testified the bullet fragments recovered were consistent with .40-caliber

10

fragments. He testified there were no bullets or bullet fragments consistent with having been fired from another caliber firearm. According to Coleman, the slug recovered from Escobar's body was consistent with being fired from the same gun that fired the bullets recovered from the victims' vehicle. Coleman opined there was only one gun used in the shooting.

On cross-examination, Coleman clarified that the bullets were consistent with having been fired from one of the firearms recovered in this case, but they were not identified as having been fired from that gun. He agreed that potentially "any .40 caliber Glock could have fired any of those bullets." He also acknowledged his opinion, that there was one gun used in the shooting, was based on the fact that law enforcement did not recover any bullets other than those consistent with .40-caliber rounds. Asked if "it could have been fired from any .40 Glock," Coleman testified, "[t]hat's correct." He also did not know if any shots fired missed the victims' vehicle. Additionally, he acknowledged there were more holes in the victims' car than there were cartridge casings recovered that he attributed to the shooting, and there were more holes in the car than bullets recovered.

A. *Verdicts and Sentencing*

The jury found defendant guilty of counts I through III and found true all special allegations and enhancement allegations. Prior to sentencing, the trial court found defendant suffered three prior strike convictions and prior serious felony convictions.

The trial court sentenced defendant on count I, special circumstance murder, to life without the possibility of parole. (§ 190.2, subd. (a)(21).) In connection with count I, the court also imposed 25 years for the section 12022.53, subdivision (d) firearm enhancement, and five years under section 667, subdivision (a)(1) for each of the three prior serious felony convictions. The court sentenced defendant to consecutive terms of 25 years to life on count II plus 20 years for the section 12022.53, subdivision (c) firearm enhancement, and 15 years for the three prior serious felony convictions. The trial court

11

imposed sentences on count III identical to those imposed on count II, with the sentences on count III to run concurrently with those on count II. The court imposed and stayed terms on all other firearm enhancements.

DISCUSSION

I

*Admission of Gang Expert Testimony*

A.    *Additional Background*

The prosecution moved in limine to admit evidence of defendant's gang affiliation. The prosecution stated that defendant and Wallace were members of the Norteño criminal street gang. The prosecutor noted investigators had observed a blue Brooklyn Dodgers baseball hat on the dashboard of the victims' vehicle which would have been visible to defendant and Wallace. According to the prosecution, the "presence of a bright blue hat on the dash board of victim's vehicle would likely have been perceived by Defendant and Wallace (and perhaps Barajas) as an indicator of the victims' affiliation with the Sureño criminal street gang." One of the victims also saw Wallace use a "four" hand sign. The prosecution stated defendant's and Wallace's gang affiliation were probative of the motive as well as the aiding and abetting theory of liability. The prosecution stated, in effect, that there was no explanation for the shooting other than gang motivation. The prosecution also sought admission of gang evidence to impeach witnesses with allegiance to the Norteño criminal street gang.

Over defendant's opposition, the trial court ruled certain specified gang evidence was relevant, substantially more probative than prejudicial, and admissible.

At trial, Detective Machuca testified as a gang expert about the Norteño and Sureño criminal street gangs. Norteños were the dominant gang in Yuba County. Varrio Linda Rifa, or VLR, was a subset of the Norteño gang that was prevalent in the area. Machuca testified Norteños identify with the color red and use four or one and four as a

gang sign representing the number 14. Sureños identify with the color blue and the number 13.

Machuca testified defendant was an active member of the Norteño criminal street gang, and that Wallace was affiliated with the Norteños. The parties stipulated defendant had a "VL" tattoo on his neck, which, according to Machuca, stood for Varrio Linda. Machuca also testified he was familiar with Chase Boyce and that he was associated with the VLR subset.

Machuca testified it was possible a blue hat on a dashboard could indicate a Sureño affiliation. He testified about respect and disrespect in gang culture. He testified that, if a gang member sees a rival gang member, "you're expected to do something" physical and possibly violent. Machuca testified that "mean mugging" is giving someone a dirty look, and that, in gang culture, mean mugging could instigate an altercation.

Machuca found it significant that Barajas was seen in a video wearing a red shirt, particularly given that he was with defendant and Wallace, who were affiliated with the Norteños.

The trial court instructed the jury with CALCRIM No. 1403 as follows: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other. You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant had a motive to commit the crimes charged. You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

B.  *The Parties' Contentions*

Defendant asserts the trial court prejudicially abused its discretion in admitting expert gang testimony where he was not charged with any gang enhancement or with a

13

substantive gang crime. Defendant emphasizes such gang-related evidence carries a high potential for being prejudicial and that such evidence is inadmissible to prove a defendant's criminal disposition.[6]

The Attorney General counters that, because "gang membership and perceived threat of a rival gang member was relevant to his motive for shooting the victims, the trial court properly admitted the [gang] evidence." According to the Attorney General, the gang evidence was substantially more probative than prejudicial, as it tended to prove defendant's motive, and it established the potential bias of three witnesses, Wallace, Boyce, and Barajas.

C.      *The Admission of Relevant Evidence and the Standard of Review*

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the

---

**6**      In his reply brief, defendant charts a different course, asserting that the "dubious evidentiary basis" of the blue hat, conflicts in Barajas's testimony, and Wallace's plea all support the conclusion that the trial court abused its discretion in admitting the gang evidence. Defendant relied on the hat and Wallace's plea in his opening brief, but in argument addressed to the sufficiency of the evidence, not his argument that the trial court abused its discretion in admitting the gang evidence. The general rule " ' "is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before." ' " (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764; accord, *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) In any event, none of these matters would establish the trial court abused its discretion in admitting the expert gang evidence.

issues, or of misleading the jury." (Evid. Code, § 352.) "Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168; see also *People v. Ramirez* (2022) 13 Cal.5th 997, 1095 (*Ramirez*) ["A court's admissibility ruling is reviewed for abuse of discretion."].)

D.      *The Admission of Gang Evidence Generally*

" 'Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.' " (*People v. Memory* (2010) 182 Cal.App.4th 835, 859; see Evid. Code, § 1101, subd. (a).) "[G]ang-related evidence 'creates a risk the jury will improperly infer the defendant has a criminal disposition' and . . . such evidence should therefore 'be carefully scrutinized by trial courts.' " (*People v. Mendez* (2019) 7 Cal.5th 680, 691.) "The risk of injecting undue prejudice is particularly high in cases where the prosecution has not charged a gang enhancement and the probative value of the gang evidence is minimal." (*People v. Flores* (2020) 9 Cal.5th 371, 402.)

"Nonetheless, 'evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*Ramirez, supra*, 13 Cal.5th at p. 1095, quoting *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) "Such evidence is admissible even when a gang enhancement is not charged, provided the probative value of the evidence is not

15

substantially outweighed by its prejudicial effect." (*Ramirez*, at p. 1095, citing *People v. Williams* (1997) 16 Cal.4th 153, 193 (*Williams*) ["[I]n a gang-related case, gang evidence is admissible if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect."].) " ' " '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' " ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 32 (*Chhoun*).)

E.  *Analysis*

The prosecution's theory at trial was that this was a gang-motivated shooting. This was based in large part on the presence of the blue hat on the victims' dashboard. Detective Machuca testified defendant was an active Norteño and Wallace was affiliated with the Norteños. He testified Sureños, rivals to the Norteños, identify with the color blue. The evidence established there was a blue baseball hat on the dashboard of Robert M.'s car at the time of the shooting. Machuca testified it was possible a blue hat on a dashboard could indicate a Sureño affiliation. Machuca also testified about respect and disrespect in gang culture, and that if a gang member sees a rival gang member, "you're expected to do something" physical and possibly violent. Barajas testified that defendant said the people in the victims' car were mean mugging him and staring at him. Machuca testified "mean mugging" is giving someone a dirty look, and that, in gang culture, mean mugging could instigate an altercation.

Evidence of defendant's gang affiliation, the Norteños' rivalry with the Sureños, and the potential for violent confrontations arising from circumstances such as those occurring here were relevant and highly probative as to defendant's motive. (See *Williams, supra*, 16 Cal.4th at p. 194 [gang evidence "tended to establish, among other things, that the victim appeared to be a member of a gang which was a deadly rival of defendant's gang"].) As the prosecutor suggested in arguing for the admission of the gang evidence, there appeared to have been no obvious explanation for the shooting other

16

than gang motivation. "While not itself an element of the crimes, motive can illuminate intent." (*Chhoun, supra*, 11 Cal.5th at p. 32.) The gang evidence admitted here was highly relevant to defendant's motive.

Moreover, the probative value of this evidence was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. (Evid. Code, § 352.) Importantly, the trial court limited the scope of the admissible gang evidence, for instance excluding any evidence of murders committed by the gang. Finally, the trial court limited any prejudicial effect of the gang evidence by instructing the jury with CALCRIM No. 1403 on the limited purposes for which that evidence was admitted.

The California Supreme Court recently decided *Ramirez, supra*, 13 Cal.5th 997, which involved the admission of uncharged gang evidence. (*Id.* at p. 1094.) In *Ramirez*, the Supreme Court held: "[T]he trial court did not abuse its discretion in concluding that the probative value of such evidence was not substantially outweighed by its prejudicial effect. [Citation.] The gang evidence was fairly brief. Deputy Contreras testified to the existence of LFS, described defendant's tattoos, and opined that he and several others were members of the gang. He did not discuss gang culture in general or describe any criminal activity committed by the gang. Although the evidence was admitted in part to prove motive, Contreras did not offer an opinion on that point. The jury was instructed on the limited use of the evidence to prove defendant's identity, motive, and intent." (*Id.* at p. 1096.) Essentially, the same conclusions apply here as in *Ramirez*: The gang evidence was fairly brief, the gang expert did not describe the gang's criminal activity, and the jury was instructed on the limited use of the evidence.[7]

---

[7] In addition to *Ramirez, supra*, 13 Cal.5th 997, courts in a number of cases have upheld the admission of uncharged gang evidence. (See *Chhoun, supra*, 11 Cal.5th at pp. 30-34 [gang evidence relevant to show a relationship to accomplices who testified

The case on which defendant principally relies is distinguishable. In *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), the jury found defendant guilty of attempted murder, shooting at an inhabited dwelling, and attempted kidnapping for carjacking, and returned true findings on gang enhancement allegations. (*Id.* at p. 217.) The defendant filed a new trial motion, asserting there was insufficient evidence to support the gang enhancement allegations and that admission of irrelevant and prejudicial gang evidence warranted a new trial on all charges. (*Ibid.*) The trial court found the evidence supporting the gang enhancement allegations to be insufficient, granted the new trial motion as to those allegations only, and denied the new trial motion as to the underlying charges, finding the gang evidence was relevant to issues of intent. (*Ibid.*) On appeal, the defendant asserted that "having found the gang evidence was insufficient to prove the gang allegations, [the trial court] should have also concluded the gang evidence was irrelevant and unduly prejudicial as to the underlying charges, and thus, the court should have granted his new trial motion in its entirety." (*Id.* at pp. 222-223.)

At trial in *Albarran*, the prosecution had argued that the motive for the shooting at issue was gang-related. (*Albarran, supra*, 149 Cal.App.4th at p. 227.) However, the appellate court in *Albarran* concluded, "there was insufficient evidence to support the contention that this shooting was done with the intent to gain respect" within the gang as the gang expert testified. (*Ibid.*) The court stated, "the motive for the underlying crimes, in particular the shooting . . . , was not apparent from the circumstances of the crime," and there was "nothing inherent in the facts of the shooting to suggest any specific gang

against the defendant and to prove identity, intent, and motive, and probative value not substantially outweighed by the risk of undue prejudice]; *Williams, supra*, 16 Cal.4th at pp. 191-197 [gang evidence relevant to motive and identity and its probative value not outweighed by prejudicial effect]; see also *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 772-773 [the defendants' gang membership was highly relevant to prove involvement, motive, and intent to kill]; *People v. Garcia* (2008) 168 Cal.App.4th 261, 274-278 [gang evidence relevant to intent and motive, the relation between the defendants, and the nature of their organization].)

motive." (*Ibid.*) The *Albarran* court further concluded that, even if evidence of the defendant's gang membership and some evidence of gang behavior was relevant to motive and intent, "other extremely inflammatory gang evidence was admitted, which had no connection to these crimes." (*Ibid.*) The *Albarran* court held that all of the evidence "was irrelevant to the underlying charges and obviously prejudicial." (*Id.* at p. 228.)

The volume and nature of the gang evidence in *Albarran* is in stark contrast to the evidence admitted here, which was highly probative as to the motive for the shooting and which did not include voluminous inflammatory and prejudicial evidence. In *Albarran*, the gang expert testified "at length" about the identities of other members of the gang, the wide variety of crimes they had committed, and the numerous contacts between the various gang members, other than the defendant, and the police. (*Albarran, supra*, 149 Cal.App.4th at p. 227.) He described a threat the gang made in graffiti to kill police officers. (*Id.* at p. 228.) The jury heard unnecessary references to the Mexican Mafia. (*Ibid.*) The *Albarran* court concluded, "[e]vidence of threats to kill police officers, descriptions of the criminal activities of other gang members, and reference to the Mexican Mafia had little or no bearing on any other material issue relating to Albarran's guilt on the charged crimes and approached being classified as overkill." (*Ibid.*) The court concluded this evidence "was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of Albarran's actual guilt." (*Ibid.*; see *id.* at p. 232 ["[t]his case presents one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair."].)

Here, unlike *Albarran*, the evidence was highly relevant and probative as to the charged offenses for the reasons stated *ante*. Additionally, the admission of gang evidence was significantly more limited, and far less inflammatory and potentially

prejudicial, than the gang evidence in *Albarran*. Defendant's reliance on *Albarran* is misplaced.

Moreover, the gang evidence here was also relevant to the bias and credibility of certain witnesses. (*People v. Pettie* (2017) 16 Cal.App.5th 23, 46 [defendant's gang involvement highly probative to a motive for assault and possibility of bias in the testimony of three reluctant witnesses]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168 [gang evidence relevant to witness's credibility].) Wallace refused to testify. He was, according to Machuca, affiliated with the Norteños. Machuca testified Boyce was associated with the VLR subset. Barajas was wearing a red polo shirt on the day of the shooting in the company of two Norteño affiliates, which Machuca found to be "significant."

In sum, the trial court did not abuse its discretion in admitting the gang evidence.

II

*Sufficiency of the Evidence—Existence of a Gang*

Defendant also asserts the evidence was insufficient to support his convictions because the prosecution failed to prove the existence of a gang. Defendant emphasizes Detective Machuca did not inform the jury what a criminal street gang is and how it is defined under section 186.22. He specifies Machuca did not testify about the " 'primary activities' " and " 'pattern of criminal gang activity' " elements necessary to prove the existence of a criminal street gang under section 186.22. According to defendant, without legally sufficient evidence to establish the existence of a gang, "the jury was never provided with evidence from which it could determine if [defendant's] alleged offenses were gang-related."

The Attorney General responds that, because the prosecution did not charge defendant with any substantive gang crimes or gang enhancements, it was not required to put forth evidence to establish each statutory element of a criminal street gang. The

20

Attorney General notes the statutory elements of a criminal street gang are not elements of any crimes charged.

We address whether substantial evidence supports the jury's verdicts more generally in part III, *post.* For purposes of defendant's contention that the prosecution failed to prove the existence of a gang beyond a reasonable doubt, we need not undertake a substantial evidence analysis. The prosecution was not required to prove the existence of a criminal street gang beyond a reasonable doubt.

The prosecution bears the burden of proving all elements of the crimes charged beyond a reasonable doubt. (See *In re Winship* (1970) 397 U.S. 358, 364 ["the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"]; *People v. Loy* (2011) 52 Cal.4th 46, 72 ["The prosecution does, indeed, have to prove all necessary elements of the crime beyond a reasonable doubt."].) The existence of a criminal street gang was not an element of any crime charged or any enhancement alleged here.

The information charged defendant with murder and attempted murder, and alleged various firearm enhancements. It did not allege a gang-related firearm enhancement. Nor did the prosecution charge defendant with active participation in a criminal street gang or assert gang enhancement allegations against defendant. None of the charges and enhancement allegations required the prosecution to prove the existence of a criminal street gang beyond a reasonable doubt.

Moreover, defendant has failed to cite any authority to directly support his argument. Nor have we found any such authority through our independent research. We conclude there is no such requirement for the prosecution to prove the statutory elements of a criminal street gang beyond a reasonable doubt in a case where gang offenses are uncharged.

21

## III

*Sufficiency of the Evidence — Murder on a Gang-motivated Theory*

Defendant asserts that, even if we conclude the evidence was not legally insufficient to support his convictions due to the absence of sufficient proof of the existence of a gang, the evidence was still insufficient to support his convictions on a gang-motivated theory. Defendant asserts there was no evidence the hat in the victims' car was a Dodgers hat commonly associated with Sureños. Defendant asserts there was no proof more than one gun was fired from Barajas's car at the victims' car. Finally, defendant asserts that, while Barajas may have been wearing a red shirt, he was not a gang member. While defendant's contentions addressed to substantial evidence focus on these three issues — the baseball hat, the ballistics evidence, and whether Barajas was a gang member — we address whether substantial evidence supports the judgment generally and then turn to defendant's contentions specifically.

"The law governing sufficiency-of-the-evidence challenges is well established and applies both to convictions and special circumstance findings. [Citations.] In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence — that is, evidence that is reasonable, credible, and of solid value — supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v.*

*Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).) " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

Here, there is substantial evidence defendant fired at the victims' car with the intent to kill. The victims testified that they were traveling in Robert M.'s car when they encountered defendant and his associates in Barajas's car. Defendant looked at them in an aggressive manner. According to both Robert M. and Victor D., Robert M. had his blue baseball hat on the dashboard of his car at the time. People in Barajas's car made hand gestures, including, according to Victor D., displaying the number four. According to Detective Machuca, Norteños use four as a gang sign representing the number 14. At some point, defendant put his hood on and pulled the drawstring so that only part of his face was visible. As the two cars were right next to each other, with Barajas's car a couple of feet back, Victor D. and Robert M. heard the first shot fired. Then they heard more gunshots. Victor D. saw the front seat passenger, defendant, shooting. Robert M. estimated there were 10 to 15 shots fired. Victor D. was shot in the shoulder and Escobar died from his gunshot wound.

Barajas's account corroborated the victims'. When he pulled up next to Robert M.'s car, defendant and Wallace grew "heated" or "upset" looking at the people in the car next to them. Barajas followed the victims' car for seven to 10 minutes on defendant's and Wallace's instructions. Wallace moved to the driver's side of the back seat and put the window down. Defendant put on his hood and tightened the drawstrings so that "not a whole lot of" his face was exposed. Defendant then stood up through the open sunroof. Barajas heard approximately 10 gunshots from behind him and from above his head. Defendant was standing in the sunroof for three to five seconds. After defendant came down from the sunroof, Barajas did not hear any more gunshots, but he did see a black gun in defendant's hand which defendant then tucked into his waistband.

23

Later, when they learned someone was shot, defendant and Wallace high-fived in a way of saying, "we got them."

Regarding defendant's positioning during the shooting, according to Victor D., the front seat passenger sat "on the window. Like got out the car to sit and look towards us." Asked if he saw "that over the top of the car or in–or in the car," Victor D. testified, "[o]n top of the car." Meanwhile, Barajas's testimony was that defendant was standing up through the sunroof. It is apparent a person in the victims' circumstances could mistake someone standing in the sunroof as someone sitting on the car door on the far side of the car. In any event, to the extent this created a conflict, it would give rise to a factual issue for the trier of fact to resolve. "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).)

Law enforcement found nine-millimeter, .30-caliber, and .40-caliber cartridge casings at the scene.[8] Spaas testified eight of the 10 cartridge casings were consistent with the Glock model 22 recovered in this case and shared individual characteristics with that firearm. Thus, two cartridge casings were not tied to that gun. This supports an inference that a second gun was used in the shooting.

Brewer documented nine bullet holes on Robert M.'s vehicle. Through trajectory rods, she determined the bullet holes generally indicated up-to-down trajectories. The up-to-down trajectories could support the premise that defendant shot from out of Barajas's sunroof. Defendant's expert was of the opinion that the bullet trajectories were too shallow to have been fired from the top of the car. However, he also acknowledged someone could lean over and shoot from below the roof line. Brewer testified it was

---

[8]    See footnote 5, *ante*.

possible the shots were fired from different heights. And Barajas testified defendant stood up through the sunroof, Barajas heard shots coming from above him as well as behind him, and, when defendant sat down, he had a gun in his hand. Again, to the extent any of this gave rise to an evidentiary conflict, "[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*Young, supra*, 34 Cal.4th at p. 1181.)

Brewer collected six bullet fragments from Robert M.'s vehicle. Concerning the bullets and bullet fragments, Spaas testified: "Well, some were more intact than others. Some were pretty much whole bullets. Some were just fragments. But the ones that were intact enough for me to take measurements, were consistent with a .40 caliber bullet." Spaas also acknowledged that there was no way to determine from the evidence whether any bullets fired missed the victims' car completely.

Defendant sent text messages the day after the incident in Fruitridge Community Park to the effect that "its over" and "[t]hey looking for us" after he fled the park, discarded a gun, and lamented the loss of his firearm. Although these text messages can be interpreted as reflecting the consciousness of guilt of having possessed a firearm in the park, they could also demonstrate defendant's consciousness of guilt with regard to the shooting as law enforcement closed in. (*Jennings, supra*, 50 Cal.4th at pp. 638-639 [we presume in support of the judgment the existence of every fact a jury reasonably could deduce from the evidence; if the circumstances reasonably justify findings made by the trier of fact, reversal is not warranted simply because circumstances might also reasonably be reconciled with contrary finding].)

Viewing the evidence in the light most favorable to the judgment (*Jennings, supra*, 50 Cal.4th at p. 638), we conclude substantial evidence supports the jury's verdicts and true findings. Moreover, substantial evidence supports the conclusion that the crimes were willful, deliberate, and premediated. " ' " '[P]remeditation' means thought over in advance," ' and ' " ' [d]eliberation' refers to careful weighing of considerations in

25

forming a course of action . . . ." ' [Citations.] 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) " ' " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Casares* (2016) 62 Cal.4th 808, 824, disapproved on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214.)

The evidence established defendant and Wallace became hostile towards the victims and then followed them for seven to 10 minutes. Defendant and Wallace ordered Barajas to catch up to the victims' car. Prior to the shooting, defendant put his hood on and tightened the drawstring, concealing much of his face. He then stood up through the sunroof and fired at the victims' vehicle. There was substantial evidence the shooting was willful, deliberate, and premeditated. And, contrary to defendant's implied contention, Wallace's guilty plea on count I does not preclude a guilty verdict against defendant on count I.

We now turn to defendant's three specific contentions, namely the evidence relating to the blue baseball hat, the ballistics evidence, and Barajas's gang status.

As for the blue hat on Robert M.'s dashboard, defendant emphasizes that, while Robert M. testified it was a Boston Red Sox hat, the prosecution maintained it was a Brooklyn Dodgers hat. Defendant characterizes the hat as the "linchpin of the prosecutor's case," and cites to *People v. Prunty* (2015) 62 Cal.4th 59, in which the Supreme Court stated that a "Los Angeles Dodgers baseball cap . . . is attire typically associated with Sureño street gangs." (*Id*. at p. 68.) In our view, it is immaterial whether the hat in Robert M.'s car was a blue Boston Red Sox hat or a blue Brooklyn Dodgers hat. As Detective Machuca testified, Sureños identify with the color blue. Whether it represented Boston or Brooklyn, the hat was blue, the color with which Sureños identify. And the evidence is clear that it would have been visible as it sat on Robert M.'s

dashboard. Machuca testified defendant was an active member of the Norteño gang, and that Wallace was affiliated with the Norteños. Machuca further testified it was possible a blue hat on a dashboard could indicate a Sureño affiliation. He also testified that, if a gang member sees a rival gang member, "you're expected to do something" physical and possibly violent.

Moreover, we do not agree with the defendant's representation as to the significance of the hat as it relates to whether substantial evidence supports the jury's verdicts and true findings. This is because "with few exceptions, motive itself is not an element of a criminal offense. [Citations.] . . . . The crimes of murder and attempted murder are no exception." (*People v. Smith* (2005) 37 Cal.4th 733, 740.) Thus, while the prosecutor obviously chose to pursue a motive to explain the shooting, he was not required to prove a motive to secure guilty verdicts on the charged offenses.

Defendant next asserts there was no showing more than one gun was fired from Barajas's car at the victims' car. This is wrong. Barajas testified that he heard gunshots coming from both above him and behind him, and, at the time, defendant was standing in the car through the sunroof. Barajas saw defendant with a gun when defendant sat back down. Barajas acknowledged on cross-examination that, in interviews with law enforcement, he did not say that, at the time of the shooting, he saw defendant with a gun. However, this conflict with his trial testimony gave rise to an issue of fact and credibility for the jury to resolve. (*Young, supra*, 34 Cal.4th at p. 1181.) Victor D. also saw that the front seat passenger, defendant, was shooting.

According to defendant, the eight bullets recovered from the victims' car were all traceable to one gun, and there was no evidence of a second gun. This contention overreaches and misstates the evidence. Spaas testified of the bullets and fragments recovered from Robert M.'s car that "some were more intact than others. Some were pretty much whole bullets. Some were just fragments. But the ones that were intact enough for me to take measurements, were consistent with a .40 caliber bullet." While

27

she testified that bullets were *consistent* with the Glock model 22 recovered in this case, she did not testify that those bullets *were in fact all fired from that Glock*. On cross-examination, asked about whether the Glock model 22 fired a particular "slug," Spaas testified: "No. No. All I said was it had the same class characteristics. I did not make any opinion on it whether it was a specific gun." Moreover, the Instagram message exchange between defendant and another user two days before the shooting suggests the possibility that defendant himself also had a Glock model 22 handgun at that time.

Additionally, as Spaas's testimony makes clear, some bullet fragments were not suitable for taking measurements so that she could make determinations about them. Spaas could not determine the caliber of these bullet fragments. Two cartridge casings recovered from the scene of the shooting were not consistent with the Glock model 22 and thus were fired from a different type of firearm. And additional bullets could have been fired at Robert M.'s car and missed.

Finally, defendant asserts Barajas was not a gang member despite the fact that he was wearing a red shirt and accompanied by Norteño affiliates on the day of the shooting. We fail to see how Barajas's status as a gang member, affiliate, "wannabe," or unaffiliated individual affects the legal sufficiency of the evidence supporting defendant's convictions.

Substantial evidence supports the jury's verdicts and true findings.

DISPOSITION

The judgment is affirmed.

        \s\                    ,
                 McADAM, J.*


We concur:


     \s\          ,
HULL, Acting P. J.


     \s\      ,
RENNER, J.

---

*      Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.